08 CV 5990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Robert M. Cominsky, Barbara Pegues, Sharon Creel and Peter J. Zeman, individually, on behalf of the Wachovia Savings Plan, and all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : | |
| Wachovia Corporation, Wachovia Bank, National Association, Wachovia Benefits Committee, Benjamin J. Jolley, John Does 1-10, Wachovia Board of Directors, John Baker II, James Balloun, Robert Brown, Peter Browning, John Casteen III, Jerry Gitt, William Goodwin Jr., Maryellen Herringer, Robert Ingram, Donald James, Mackey McDonald, Wallace Malone, Joseph Neubauer, Lloyd Noland III, Timothy Proctor, Ernest Rady, Van Richey, Ruth Shaw, Lanty Smith, G. Kennedy Thompson, John Whitaker Jr. and Dona Young, | : : : : : : : : : : : : : : : | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA) |
| Defendants. | : : | |

Plaintiffs Robert Cominsky, Barbara Pegues, Sharon Creel and Peter J. Zeman

("Plaintiffs"), individually, as representatives of the Wachovia Savings Plan (the "Plan"), and on

behalf of a class of similarly situated participants in the Plan (the "Participants"), by their

attorneys, allege the following for their Complaint ("Complaint"):

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      Plaintiffs, Participants in the Plan, bring this action against Wachovia Corporation

("Wachovia" or the "Company") and others individually, as representatives of the Plan and on

behalf of a class of all Participants in the Plan for whose individual accounts the Plan invested in the Wachovia Corporation Common Stock Fund (ESOP) and the Wachovia Corporation Common Stock Fund Non-ESOP (collectively, the "Funds") from May 7, 2006 to the present (the "Class Period"). Plaintiffs bring this action on behalf of both the Plan and the Plan Participants and beneficiaries pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3).

2.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty. Plaintiffs also seek equitable relief.

3.     Plaintiffs claims arise out Defendants' misrepresentations and failures to disclose material adverse information concerning Wachovia's massive risks and liabilities arising out of its structured and mortgage lending businesses.

4.     These misrepresentations and failures to disclose artificially inflated the value of Wachovia's common stock, and thus the value of the Funds. Yet, throughout the Class Period, the Plan continued to invest in the Funds and the Funds continued to invest in Company stock.

5.     Defendants breached their fiduciary duties by permitting the Plan to offer the Funds as and investment option and by permitting the Funds to invest in Company stock because the artificially-inflated price of shares of the Funds and Company stock rendered these investments imprudent. Defendants also breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning

the Plan's assets and benefits and investing in the Funds. Those Defendants who had a duty to appoint and monitor the fiduciaries with authority or control over Plan assets breached their duty to properly appoint and monitor. Finally, Defendants are liable as co-fiduciaries.

6.     Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

7.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

### THE PARTIES

**Plaintiffs**

8.     Plaintiff Robert Cominsky is a resident of the State of North Carolina. He is a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

9.     Plaintiff Barbara Pegues is a resident of the State of Georgia. She is a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

10.     Plaintiff Sharon Creel is a resident of the State of Florida. She is a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

11.     Plaintiff Peter J. Zeman is a resident of the State of Michigan. He is a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

**Defendants**

12.     Defendant Wachovia Corporation is a corporation organized and existing under the laws of the state of North Carolina with its principal place of business at One Wachovia Center, Charlotte, North Carolina. Wachovia is the Sponsor and an administrator of the Plan.

13.     Defendant Wachovia Bank, National Association ("Wachovia Bank") is a corporation organized and existing under the laws of Massachusetts with offices at 301 S.

College Street, Charlotte, North Carolina. On information and belief, Wachovia Bank is wholly owned and controlled by Wachovia. Wachovia Bank is the Trustee of the Plan.

14.    Defendant Wachovia Benefits Committee (the "Committee") is, on information and belief, an association of Wachovia employees responsible for the administration of the Plan. On information and belief, the Committee is the both the Plan Administrator and the Named Fiduciary of the Plan.

15.    Defendant Benjamin J. Jolley ("Jolley") is a Wachovia Senior Vice President and member of the Committee.

16.    John Does 1-10 are the other members of the Committee (together with Jolley, "Committee Members") whose names are not currently known. On information and belief, all of the Committee Members were, like Jolley, members of Wachovia senior management who knew or should have known the adverse facts alleged herein on account of their positions and access to the relevant information.

17.    Defendants John Baker II, James Balloun, Robert Brown, Peter Browning ("Browning"), John Casteen III, Jerry Gitt, William Goodwin Jr., Maryellen Herringer, Robert Ingram ("Ingram"), Donald James, Mackey McDonald ("McDonald"), Wallace Malone, Joseph Neubauer, Lloyd Noland III, Timothy Proctor ("Proctor"), Ernest Rady, Van Richey, Ruth Shaw ("Shaw"), Lanty Smith, ("Smith"),  G. Kennedy Thompson, ("Thompson"), John Whitaker Jr. and Dona Young were all members of Wachovia's Board of Directors. The Wachovia Board of Directors and its members ("Director Defendants") are the appointing fiduciaries, responsible for selecting and monitoring the members of the Committee.

4

18.    Director Defendants Shaw, Browning, Ingram, McDonald and Proctor were also members of the Management Resources & Compensation Committee which, according to the Company's Form DEF 14A filed with the Securities and Exchange Commission ("SEC") on March 10, 2008 ("2008 Proxy Statement"), was responsible for "administering various employee benefit plans" including, on information and belief, the Plan.

## CLASS ACTION ALLEGATIONS

19.    **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between May 7, 2006 and the present and whose accounts included investments in Wachovia Corporation stock.

20.    **Class Period.**  The fiduciaries of the Plan knew or should have known at least by May 7, 2006 that the Company's material weaknesses adversely offering its structured and mortgage lending businesses were so pervasive that Company stock could no longer be offered as a prudent investment for retirement Plan.

21.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plan Form 5500 Annual Return filed with the Internal Revenue Service ("IRS") and

dated October 14, 2005, more than one hundred thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

22.     **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

b.     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c.     whether Defendants violated ERISA; and

d.     whether the Plan suffered losses and, if so, what is the proper measure of damages.

23.     **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan are not only typical of, but identical to claims under this section brought by any Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

24.     **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action,

complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

25.    **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

26.    **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants, (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DESCRIPTION OF THE PLAN

27.    The Plan is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A).

28.    The purpose of the Plan is to encourage Wachovia employees to save money for their retirements. According to the Plan's 2006 Plan Information Statement ("PIS"):

> The purpose of the Plan is to encourage eligible employees to save toward their retirement by providing a convenient investment vehicle for tax-deferred earnings on before-tax and after-tax contributions as well as matching employer contributions. The Plan also provides participants with a source of funds for use upon termination of employment and in the event of certain emergencies.

29.    Similarly, according to the Plan's 2007 Summary Plan Description ("SPD"):

The Wachovia Savings Plan is a tax-qualified 401(k) plan with an employee stock ownership plan feature that helps you accumulate savings for retirement. At retirement, your Wachovia Savings Plan benefits will supplement the Wachovia Pension Plan and Social Security benefits to which you may be entitled.

The Wachovia Savings Plan:

Offers a convenient way to save. Generally, you may save up to 30 percent of your Benefits Eligible Compensation each year through convenient payroll deductions.

Supplements your contributions with an employer match. Wachovia's matching contributions help your savings grow even faster - a portion of your contributions is matched based on a percentage determined on an annual basis. The match generally is available after one year of employment.

Provides a portion of Wachovia matching contributions in Wachovia Corporation common stock.

Lets you save on a tax-deferred basis. Your before-tax contributions and employer matching contributions are not currently taxable to you, and all contributions grow tax-deferred.

Gives you the opportunity to invest in your future. You can invest your savings and employer matching contributions in any one or a combination of investment funds offered under the Wachovia Savings Plan.

Offers immediate vesting. You are always 100 percent vested in your contributions and Wachovia's matching contributions, plus any investment gains and/or losses on those contributions.

Helps you meet short-term needs as you prepare for the future. While the Wachovia Savings Plan is designed to help you save for the future, you can meet certain short-term needs through flexible loan and withdrawal provisions.

30.    The Plan is a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement

benefits provided by the Plan are based solely on the amounts allocated to each individual's Plan account.

31.    The Plan is a voluntary contribution Plan whereby Participants may contribute up to 30% of their eligible employment compensation to the Plan ("Employee Contributions").

According to the PIS:

> Currently, participants may contribute a percentage, ranging from 1% to 30%, of their "Benefits Eligible Compensation" to the Plan, in increments of 1%. Benefits Eligible Compensation is comprised of a participant's base salary, hourly wages, overtime, shift differential pay, and 70% of eligible functional incentive pay, before reduction by before-tax contributions under the Plan (including catch-up contributions) or by the participant's contributions under Wachovia's flexible benefits program. Benefits Eligible Compensation generally does not include fees, commissions, cash incentives, cash bonuses, reimbursement of expenses. Salary deferrals under a non-qualified deferred compensation program, severance, or employer. Contributions to the flexible benefits program (e.g., service-based and medical credits) or any other Wachovia plan or any other form of compensation not otherwise included above. Contributions can be made on a before-tax and/or after-tax basis. Federal law limits the amount of eligible compensation that may be taken into account in any year.

32.    Wachovia made contributions to the Plan which matched the Employee Contributions up to 6% of the employee's eligible compensation ("Matching Contributions").

According to the PIS:

> Wachovia currently matches a participant's before-tax and after-tax contributions on a dollar-for-dollar basis up to 6% of eligible compensation. Each year, Wachovia's Senior Executive Vice President of Human Resources determines (i) the maximum amount participants may contribute that will be matched, and (ii) the matching rate – how much will be contributed by Wachovia for each dollar of participants' contributions. The Chief Executive Officer of Wachovia reserves the right to decrease the maximum amount of participant contributions that will be considered contributions eligible to be matched and the matching rate prospectively at any time. These contributions will be made at approximately the same time that participant contributions are made.

33.   A portion of the Matching Contributions was automatically invested in either the Wachovia Corporation Common Stock Fund (ESOP) or the Wachovia Corporation Common Stock Fund Non-ESOP.  According to the PIS:

> Employer matching contributions equal to 1% of the participant's eligible compensation will automatically be invested in the Wachovia Corporation Common Stock Fund (ESOP) for participants who work for corporations, or for entities taxable as corporations (other than a subsidiary of an entity taxable as a partnership), and to the Wachovia Corporation Common Stock Fund Non-ESOP for participants who work for entities taxable as partnerships (or one of its subsidiaries), such as employees of the retail brokerage and clearing businesses of Wachovia Securities Financial Holdings, LLC (or any of its subsidiaries).

34.   Participants could direct the Plan to invest Plan assets held in their individual accounts, including the Matching Contributions (a portion of which was initially automatically invested by the Company in the Funds), among a number of Investment Options offered by the Plan.

35.   Among the Investment Options which Participants could select for investment of their Plan accounts were the Funds.

36.   The assets of the Plan are held in trust by the Plan Trustee, Wachovia Bank, pursuant to a trust agreement between Wachovia and Wachovia Bank (the "Trust").

## DEFENDANTS WERE FIDUCIARIES

37.   Section 402(a)(1) of ERISA requires every plan to provide one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).  In addition, pursuant to Section 3(21)(A) of ERISA, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to

him where by his conduct he engages in fiduciary activities. 29 U.S.C. § 1102(21)(A). The test

for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those

who have control over management of a plan or plan assets are fiduciaries regardless of the

labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the

express remedial purpose of ERISA, the definition of "fiduciary" is construed broadly.

38.    The SPD specifically acknowledges that the people who operate the Plan are

"fiduciaries" subject to ERISA's fiduciary duty obligations:

39.    In addition to creating rights for plan participants, ERISA imposes duties upon

the people who are responsible for the operation of the employee benefit plan. The people who

operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the

interest of you and other plan participants and beneficiaries.

40.    The Committee and the Committee Members are, and at all times relevant to the

allegations of this Complaint were, fiduciaries of the Plan because, pursuant to Section 402(a)(1)

of ERISA, the Committee was the "Named Fiduciary" and Plan Administrator of the Plan. SPD,

p. 31 ("Plan Administrator: Benefits Committee"); PIS, p. 9 ("Administration of the Plan: The

Plan is administered by the Committee").

41.    The Committee and the Committee Members are also fiduciaries of the Plan

under the functional definition of Section 3(21)(A) of ERISA, as they had responsibility for

selecting and monitoring the prudence of the investment options offered under the Plan including

the Funds. PIS, p. 9. In particular, the Committee had clear discretion to suspend the Funds as

available investment options should they become imprudent. According to the PIS:

The Wachovia Benefits Committee (the "Committee") may suspend transfers into or out of the Wachovia Corporation Common Stock Fund (ESOP) or the Wachovia Corporation Common Stock Fund Non-ESOP under certain circumstances.

42.    Wachovia Bank is a fiduciary because, as the Plan Trustee, it had authority or control respecting the management or disposition of plan assets. SPD, p. 31-2 ("The assets of the Wachovia Savings Plan are held in a trust.  The trustee can be contacted at: Wachovia Bank, National Association . . .").

43.    Wachovia is a fiduciary because it managed, administered and operated the Plan, exercised authority or control over the management and disposition of Plan assets and disseminated Plan communications to Participants.  In particular, the Benefits Committee delegated its responsibility for administering the Plan to the Human Resources Division of Wachovia.  SPD, p29 ("The Committee has delegated to the Human Resource Division of Wachovia Corporation certain of its administrative responsibilities."); PIS, p. 9 ("The Committee has delegated to the Human Resources Division of Wachovia the responsibility for the daily operation, administration (including employee eligibility and benefit claims and appeals) and interpretation of the Plan.)  Pursuant to this delegation, Wachovia administered the Plan. Upon information and belief, Wachovia, through its treasury, human resources, and legal departments, directed Wachovia Bank concerning the investment of Plan assets in the Funds and the Funds' investment in Wachovia common stock.  In particular, the Trustee was directed by means of a Company website maintained by Wachovia's human resources department. Upon information and belief, the Committee met infrequently and spent very little time on matters relating to administration of the Plan and Plan investments.  Rather, upon information

and belief, these jobs were performed by Wachovia employees acting in the scope of their day-to-day duties and, in particular, by Wachovia human resources, legal, corporate communications, finance and treasury personnel.

44.    Upon information and belief, the Committee Members were appointed and served on the Committee as part of and in the ordinary course of their job responsibilities without any additional compensation.  Accordingly, the Company is responsible and liable for their actions.

45.    The Director Defendants were fiduciaries of the Plan because they had the power and authority to appoint the members of the Committee. PIS, p. 9.  On information and belief, Directors Browning, Ingram, McDonald, Proctor and Shaw also had responsibilities for administering the Plan through their service on the Management Resources & Compensation Committee.

## FIDUCIARY DUTIES UNDER ERISA

46.    **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

47.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty –

that is, the duty to "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

participants and their beneficiaries . . . ."

48.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them

promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to

the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries

themselves or the plan sponsor.

49.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary

the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in

the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man, acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and

with like aims. . . ."

50.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to

disclose and inform.  These duties entail: 1) a negative duty not to misinform; 2) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a

duty to convey complete and accurate information material to the circumstances of participants

and beneficiaries.  These duties to disclose and inform recognize the disparity that may exist, and

in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and

the Participants, on the other.

51.    Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. Defendants were required to furnish the SPD and a Prospectus (the PIS) to Participants. The SPD, the PIS and all information contained or incorporated therein constitute representations in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

52.    The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted. 29 C.F.R. § 2520.102-2(b). Here, Defendants purported to make that required disclosure concerning the Funds by incorporating by reference into the PIS all of Wachovia's filings under Sections 13(a) and (c), 14

and/or 15 of the Securities Exchange Act. Additionally, the SPD and PIS expressly directed Participants to the Company website for such information.

53. **The Duty to Investigate and Monitor Investment Alternatives.** With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

54. **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

    a.    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

    b.    are knowledgeable about the operations of the Plan the goals of the Plan and the behavior of Plan's participants;

    c.    are provided with adequate financial resources to do their jobs;

    d.    have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

    e.    have access to outside, impartial advisors when needed;

f.    maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

g.    report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand and approve the conduct of the hands-on fiduciaries.

55.    **The Duty to Disregard Plan Documents When Necessary.** A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not follow the plan document if doing so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

56.    **Co-Fiduciary Liability.** A fiduciary is liable for the breaches of other co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

a.    In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

b.    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

c.    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

d.      if he has knowledge of a breach by such other fiduciary, unless he makes

reasonable efforts under the circumstances to remedy the breach.

57.     **Non-Fiduciary Liability.**  Under ERISA non-fiduciaries who knowingly

participate in a fiduciary breach may themselves be liable for certain relief under ERISA §

502(a)(3), 29 U.S.C. § 1132(a)(3).

**PARTICIPANTS ARE NOT RESPONSIBLE FOR
IMPRUDENT PLAN INVESTMENTS**

58.     The fact that Participants selected investments from options pre-selected by

Defendants is no defense in this case.  Fiduciaries can shift liability for imprudent investments to

Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet

five specific requirements:

a.      they disclose in advance the intent to shift liability to Participants;

b.       they designate the Plan as a "404(c) plan" and adequately communicate

this to Participants;

c.      they ensure that Participants are not subject to undue influence;

d.       they provide an adequate description of the investment objectives and risk

and return characteristics of each investment option; and

e.      they disclose to Participants all material information necessary for

Participants to make investment decisions that they are not precluded from disclosing under

other applicable law.

59.     In this regard, fiduciaries have a choice: they can disclose all material information

to Participants, including information that they are not required to disclose under the securities

18

laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii). Here, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the PIS all of Wachovia's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act. Additionally, the PIS expressly directed Participants to Wachovia's Human Resources Department website for such information.

60.     Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

## SUBSTANTIVE ALLEGATIONS

61.     Wachovia is the fourth largest U.S. bank, with approximately 3,400 branches in around 20 eastern and southern states, as well as California.  Retail brokerage Wachovia Securities has more than 3,300 offices across the United States.

**A.    Defendants' False or Misleading Statements Caused Artificial Inflation in The Price of Wachovia Stock, Making it an Imprudent Investment**

62.     During the Class Period, Defendants made materially false or misleading statements concerning the quality of its mortgages and its exposure to problems in the subprime mortgage market that caused the price of Wachovia stock (and as a result, the value of Fund shares) to be artificially inflated.

**1.    The Golden West Acquisition**

63.     On May 7, 2006 Wachovia announced it would acquire Golden West Financial Corporation ("Golden West") in a deal worth approximately $26 billion.  The terms of the

acquisition provided that Golden West shareholders would receive 1.051 Wachovia shares and $18.65 in cash, or $81.07 a share, an approximately 15% premium over Golden West's closing price on May 5, 2006.

64.    As of May 2006, Golden West had 285 branches, with more than 120 branches in California, and almost all of the Golden West's loans were adjustable rate mortgages on residential properties, with interest rates that changed monthly.

65.    In a Wachovia press release filed with the Securities and Exchange Commission ("SEC") on Form 8-K on May 8, 2006, Defendant Kennedy Thompson, Wachovia's chairman and CEO, emphasized that the proposed acquisition brought together two companies "known for . . . pristine credit quality."

66.    Securities analysts immediately questioned the wisdom and timing of Wachovia's decision to purchase Golden West.  For example, Richard Bove, an analyst at Punk Zeigel & Co. questioned the decision "at a time when the housing market is slowing" and Golden West's "portfolio is made up almost entirely of mortgages."  Similarly, Gerard Cassidy, an analyst at RBC Capital Markets, noted that Golden West "derives its earnings from mortgage lending, and we're at a point in the mortgage cycle when origination volumes are declining."  As reported in a May 8, 2006 Bloomberg News Story entitled, "Wachovia's Thompson Defends Deal Against Critics," Prudential Equity Group, Atlantic Equities and Friedman Billings Ramsay & Co. all cut their Wachovia ratings because of the deal, which more than doubled the bank's home-loan portfolio.  Not only were analysts concerned about Wachovia's decision to increase its exposure to mortgage lending generally, they were concerned about the specific type of mortgages that

made up the majority of Golden West's portfolio.  As reported in the May 8, 2006 Bloomberg

article:

> Bove and other analysts expressed concern about Golden West's reliance on pay-option ARMs, which offer customers the choice of a minimum payment that's less than the interest owed.  The bank, which has been offering option ARMs since regulators approved them in 1981, says such mortgages make up "almost all" of its loans.  In contrast, option ARMs accounted for only 4 percent of the loans originated by U.S. lenders in the first half of 2005, according to a survey by the Mortgage Bankers Association.  The loans have drawn the attention of the Federal Reserve and other bank regulators, who worry that they are being offered to consumers who barely qualify and who aren't schooled on how much their payments will rise. . . .  "We believe this product will prove to be nuclear waste," Bove at Punk Zeigel wrote in a research note yesterday.  Bove said the mortgages are prone to defaults as interest rates rise.

67.    Defendant Thompson responded to these critics by stressing the quality of Golden

West's mortgage assets.  As reported in the May 8, 2006 Bloomberg article, Thompson stated

that "Golden West is a very conservative lender. Even if housing prices go down, they're going

to do extremely well . . . . You would have to have huge unemployment and a huge downdraft in

home values before this product got hit in any big way,"

68.    On July 20, 2006, Wachovia issued a press release announcing its financial results

for the second quarter ended June 30, 2006.  The July 20, 2006 press release stated, inter alia,

that "credit quality continues to be stellar," and quoted Defendant Thompson as stating that "in

the face of a challenging yield curve environment, we generated double-digit revenue and

earnings growth driven by solid execution. . . . Our fundamentals remain strong with improving

overhead efficiency, stellar asset quality and industry leading customer service.  We're excited

about our prospects as we work with [Golden West] as we extend our brand promise to

customers nationwide."

21

69.    On July 20, 2006, Defendant Wurtz gave an interview with Bloomberg News, in which he stated, inter alia, that Wachovia's second quarter financial results were the result of "pristine credit quality," that Golden West's "credit quality remains extraordinary," and explained that if interest rates remained level or dropped in the future, it would result in a "windfall" to Golden West's profits.

70.    On July 20, 2006, in a Bloomberg News Story concerning the Golden West merger, Defendant Thompson made the following statements concerning Golden West's profit and integration:

> "I continue to feel better than I did on the day we announced the deal about the prospects for this transaction. . . . We've also had a chance to see all of their branch locations and we continue to be very pleased with the affluent areas where they're located. . . . We had an assumption going in that credit underwriting at Golden West was really good and boy do we feel strongly about that after a couple of months working with them."

71.    On October 1, 2006, Wachovia completed the merger with Golden West.

72.    On October 13, 2006, the Wall Street Journal reported that there might be concerns about the impact of the Golden West transaction, and that analysts were awaiting the results of Wachovia's upcoming (October 16, 2006) report of its financial results for the quarter ended September 30, 2006. One concern discussed was that adjustable rate mortgage loans made by Golden West could turn sour. However, in a press release dated October 16, 2006, reported to the SEC on Form 8-K, Wachovia asserted, inter alia, that "credit quality continues to be strong," and reported a provision for credit losses of $108 million (as largely reflecting growth in auto lending and other consumer loans as well as lower commercial loan recoveries), net charge offs of $116 million, and total nonperforming assets of $782 million. The press

release also quoted Defendant (and then - CEO Thompson as stating that "[i]n the face of a challenging yield curve environment, we continued to improve efficiency, while asset quality remained strong."

73.    From the time that the Golden West deal was consummated until at least August of 2007, Wachovia and its senior management consistently reassured investors about the high quality of its credit in documents filed with the SEC.  In its quarterly 10-Q reports for the third quarter of 2006 through the second quarter of 2007 (filed on November 3, 2006, May 4, 2007, and July 30, 2007) and in its annual 10-K report for 2006 (filed on February 28, 2007) Wachovia consistently described its credit quality as "strong" or "stellar," based largely on Golden West's "strong underwriting and credit management."  Similarly, in preliminary earnings announcements reported to the SEC on Forms 8-K on January 23, 2007, April 16, 2007, and July 20, 2007, the Company represented that it had continued strength in credit quality," "solid" credit quality, and a "highly collateralized loan portfolio."

74.    In interviews with the media and conference calls with investors during the Class Period, Company executives went to great lengths to assure investors that disruptions in the housing and credit markets would have minimal impact on Wachovia because the Golden West mortgage portfolio was of better quality.

75.    For example, On October 16, 2006, Wachovia CFO Thomas Wurtz gave an interview with Bloomberg News, in which he stated, inter alia, that Wachovia's credit quality in the third quarter ended September 30, 2006 was "extraordinary" and that there were "no signs of weakness."  Wurtz also stated that Golden West's credit quality was "outstanding."

76.    In a February 21, 2007 interview with CBNC, Defendant Thompson asserted that, although there was "some trouble in the subprime area," it did not concern him because "with our company, we have got sterling credit quality." Furthermore, he represented that "Golden West we think is the quality mortgage company in the country" which was "a quality organization that has done a fantastic job."

77.    In an April 16, 2007, conference call with investors, Defendant Thompson stated that "with the integration of Golden West on track, we feel confident about the superior credit quality of our mortgage portfolio", and represented that Golden West used "very conservative underwriting standards."

78.    In the same April 16, 2007 conference call, Wachovia's Chief Financial Officer characterized Golden West's credit performance as "strong" and promised that "we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices." Don Truslow, the Company's Chief Risk Officer, discussed credit quality in detail, emphasizing that Golden West's loans "are very conservatively underwritten at low loan-to-values with particular attention paid to the quality of the appraisals."

79.    In a Form 8-K filed with the SEC on July 20, 2007, the Company reported:

"Our second quarter performance reflects our continued focus on execution in both the traditional banking and markets-related businesses," said Ken Thompson, Wachovia chairman and chief executive officer. "All four of our major businesses delivered double-digit earnings growth, fueled by new markets, revenue growth initiatives and an expanded product set. The integration of Golden West is proceeding as planned, and we're excited by the cross-sell potential of our expanded platform. Additionally, our focus on efficiency and risk management continues to provide flexibility for investment for future growth."

80.    On July 20, 2007, Wachovia conducted a conference call with securities analysts and investors. Despite a rise in nonperforming assets of 18.7 percent from the previous quarter, Wachovia's Chief Risk Officer Donald Truslow predicted that rising delinquencies would not lead to material losses, reassuring investors that "[o]ur portfolio is very well secured and has demonstrated low loss content over time."

81.    On August 21, 2007, Wachovia issued a press release announcing a 14 percent increase in the Company's regular quarterly cash dividend to 64 cents per common share, up from the current 56 cents per share. Defendant Thompson was quoted in the press release as stating, inter alia, that "Today's announcement reflects our Board's confidence in Wachovia's capital strength, liquidity, prudent risk profile and our future."

82.    Efforts to portray Wachovia's loan portfolio as being immune, or largely immune, from the downturn in the real estate market due to its "pristine" credit quality and "conservative" underwriting standards were materially false or misleading. Golden West was the largest "option ARM" lender in the country, with option ARMs making up the majority of its portfolio. Option ARMs are designed to permit the borrowers initially to make minimum payments that are less than the interest owed. Without rapidly increasing housing prices, pay option ARMs rapidly lead to unsustainably low debt-to-equity ratios. In a market downturn, the result is that principal on the debt rises while the property value drops, leading to negative equity and more defaults. Thus, far from being immune to a real estate downturn, Wachovia was heavily exposed to it largely as a result of its acquisition of Golden West.

**2.    Wachovia's Mortgage Exposure**

83. On October 19, 2007, Wachovia issued a press release announcing poor financial results for the third quarter ended September 30, 2007. In the October 19, 2007 press release, Wachovia reported earnings per share of $.89 per share, which Wachovia attributed to "disruption in the capital markets resulting in valuation losses of $1.3 billion before tax and reduced origination and distribution revenues in the Corporate and Investment Bank." Nonetheless, the Company put a positive "spin" on these developments, stating:

> "I'm very proud of our ability to provide capital, liquidity and advice to our customers and peers in the face of the disruption in the fixed income markets in the third quarter. These conditions clearly had a disappointing impact on the results of market-oriented businesses, but the strength in our core banking and brokerage businesses continued to serve us very well," said Ken Thompson, Wachovia chairman and chief executive officer. "Our loan and deposit trends were solid, and our retail brokerage performance was strong – and poised for even more growth as our A.G. Edwards colleagues join our team. Additionally, the first of our World Savings branch and deposit conversions was completed successfully last weekend, and going forward, attention in our expanded platform returns fully to sales production. While the impact of the market disruption was significant, it's worth noting that the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses. Looking ahead, we're taking the appropriate steps to ensure that as markets remain unsettled, we focus intently on actively managing our exposures and controlling costs. Longer term, we believe the challenges of the third quarter will be an advantage to companies like Wachovia with strong capital and liquidity positions and a clear understanding of the needs of customers and investors."

84. The October 19, 2007 press release also reported that Wachovia recorded a provision for credit losses of $408 million (purportedly reflecting modest deterioration in credit

quality, a more uncertain credit environment and loan growth), net charge-offs of $206 million, and total nonperforming assets of $3.0 billion. Wachovia further disclosed that:

> net charge-offs rose 3 basis points to an annualized 0.19 percent of average net loans. Increased provision for credit losses reflects modest deterioration in credit quality, a more uncertain credit environment and loan growth. Higher nonperforming assets largely related to Golden West consumer real estate NPAs and to higher commercial real estate NPAs largely related to downgrades of residential developers.

85.    The October 19, 2007 press release further reported that the market valuation losses of $1.3 billion consisted of (i) $488 million on commercial mortgage structured products, (ii) $103 million on consumer mortgage structured products, (iii) $438 million in collateralized debt obligations, collateralized loan obligations and other structured credit products and (iv) $272 million in leveraged finance net of fees.

86.    Following this news, Richard Bove, an analyst with Punk, Ziegel & Co., lowered his rating on Wachovia stock due to the "significant deterioration in the quality of Wachovia's loan portfolio, evidenced in its third quarter report." Bove stated that in "the past four quarters, Wachovia has written off a net $651 million in troubled credits. Its nonperforming assets have risen by $2.2 billion in the same time frame. This means that bad loans are going on the books more than four times faster than they are being written off. This further suggests that there will be a sizable write-off in the future to square the difference."

87.    Following this news on October 19, 2007, the price of Wachovia common stock dropped significantly, and continued to drop through the first week of November 2007.

88.    Then, on November 9, 2007, Wachovia filed an 8-K with the SEC, which reported that the Company was setting aside an additional $600 million in the fourth quarter and

said the value of securities linked to subprime mortgages dropped by $1.1 billion in October

2007. This followed write-downs of $1.3 billion in the third quarter. Wachovia stated:

> Wachovia Corporation today is providing information on the impact of market volatility on its financial results for the month of October and is providing further information on its expectation for credit costs for the fourth quarter of 2007 and certain additional information. Wachovia is providing this information in advance of a presentation by a senior executive on November 9, 2007 to investors and. analysts. This same information will be included in Wachovia's Third Quarter Report on Form 10-Q that will be filed on November 9, 2007:
>
> October Market Events.   Following our October 2007 announcement of third quarter 2007 results of operations and our financial outlook for the remainder of 2007, certain financial markets experienced further deterioration, particularly the markets for subprime residential mortgage-backed securities ("RMBS") and for collateralized debt obligations ("CDOs") collateralized by RMBS ("ABS CDOs"). In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.
>
> The value of CDOs we have in our portfolio depends on the value of the underlying collateral. ABS CDOs experienced declines in value correlated to the declines in value of subprimeRMBS in October. Our third quarter 2007 market diSruption-related losses'totaling $1.3 billion pre-tax included $347 million of subprnne-related valuation losses, net of hedges, on ABS CDOs. Due to the October market detericiration, these ABS CDOs experienced further declines in: value in the month of October 2007 by an amount we currently estimate. to be approximately $1.1 billion pre-tax.. At October 31, 2007, we had remaining exposure to ABS CDOs of $676 million, including on-balance sheet positions and the notional amount of off-balance sheet positions, compared to $P billion at September 30, 2007.
>
> We have exposure to subprime RMBS in other positions totaling $2.1 billion at both October 31, 2007, and September 30, 2007. Estimated aggregate valuation losses of these other positions during the month of October 2007 are immaterial net of hedges.
>
> Of the remaining asset classes where we recorded market disruption-related losses in the third quarter of 2007, the aggregate net market value changes in October in these investments have not been significant. These asset classes include commercial mortgage, leveraged finance, consumer mortgage, and other structured credit products not collateralized by subprime RMBS. Some of the markets for these asset classes continue to demonstrate poor

liquidity and higher than typical volatility while others have displayed moderate stability in October.

      The fair values of all of our assets that are subject to market valuation adjustments, including subprime RMBS and ABS CDOs, depend on market conditions and assumptions that may change over time. Accordingly, the fair values of these investments in future periods, including at the end of the fourth quarter, and their effect on our financial results, will depend on future market developments and assumptions and may be materially greater or less than the changes in values during October discussed above. For example, markets for all asset classes discussed above have remained extraordinarily volatile in the first week of November, with additional rating agencies' downgrades on subprime RMBS and ABS CDOs, and credit spread widening and illiquidity.

      Wachovia has historically been a major participant in structuring and underwriting CDOs. As measured by lead underwriter league table rankings, . Wachovia ranked 3rd for both the first nine months of 2007 and the full year 2006, with issuance volumes of $19.6 billion and $23.4 billion, respectively. The primary focus of Wachovia's CDO business has been, and continues to be, transactions backed by commercial loans and commercial real estate loans. Our issuance of ABS CDOs has been limited. We originated three ABS CDOs in the first nine months of 2007 and six in full year 2006, accounting for approximately 16 percent and 23 percent, respectively, of the total issuance volume of our CDO business during these periods.

      Additionally, due to anticipated loan growth and the impact of continuing credit deterioration in our lean portfolio, we expect to increase our allowanee for loan losses in the fourth quarter of 2007. The expected credit deterioration will likely be focused in certain geographic areas that have recently experienced dramatic declines in housing values. We expect that these declines will correlate to increases in loan losses for loans originated within the last two years within these geographic areas. Accordhigly, Wachovia now expects to record a loan loss provision in the fourth quarter of 2007 by an amount estimated to be between $500 million and $600 million in excess of charge-offs for the quarter. The actual provision will be determined in accordance with our policies and procedures, will depend on credit conditions and assumptions at quarter-end and may be materially greater, or less than the range discussed in the preceding sentence.

89.    As the Associated Press reported on November 9, 2007, after Wachovia's

announcement:

      Wachovia Corp. said Friday the value of securities it owns that are backed by loans sank by about $1.1 billion in October, making it the latest major financial institution to warn of continuing losses in the credit markets.

The nation's fourth largest banking company also said it plans to boost its allowance for loan losses in the fourth quarter due to expected credit deterioration in the housing market in certain regions.. The provision is pegged at $500 million to $600 million in excess of charge-offs in the quarter.

Wachovia shares dropped $1.43, or 3.6 percent, to $38.87 in morning trading Friday after falling to a new 52-week low of $38.05.

The news heightened fears that the fallout from the subprime turmoil is spreading deeper into credit markets. It also raised questions about the bank's October 2006 acquisition of adjustable-rate mortgage lender Golden West Financial. Corp. of Oakland, Calif

"We believe the company is trying to get ahead of likely higher future, mortgage losses in California," Deutsche Bank Securities analyst Mike Mayo wrote in a client note. "Per Golden West, it now becomes even more obvious that Wachovia purchased the thrift at the wrong time of the cycle."

The weakening markets – which Wachovia estimates could get worse over the last two months of the quarter cut the value of the bank's so-called collateralized debt obligations by more than 60 percent.

As of Sept. 30, Wachovia had $1.8 billion in CDO exposure; after the latest writedowns, the exposure is now $676 million.

CDOs are complex instruments that combine slices of different kind of risk. CDOs are often backed, in part, by subprime mortgages – loans given to customers with poor credit history. As those mortgages have increasingly defaulted, the value of the CDOs has plummeted.

Wachovia has an additional $2.1 billion of exposure to more traditional subprime mortgage-backed bonds. The value of those holdings remained steady in October as hedging strategies offset losses.

In a regulatory filing with the Securities and Exchange Commission, the financial services provider said the market in November so far remains "extraordinarily volatile."

Analysts polled by Thomson Financial, on average, were forecasting earnings of $1.08 per share for Wachovia before the writedown announcement.

Friedman Billings Ramsey analyst Gary B. Townsend predicted Friday that Wachovia's shares "will remain under pressure until real estate markets and nonperforming assets levels stabilize."

90.    On February 28, 2008, Wachovia filed its annual report for the year ended

December 31, 2008 with the SEC on Form 10-K (the "2007 10-K"). The 2007 10-K reported,

among other things, total assets of $782,896 million, the market value of its collateralized

mortgage obligations as $17,682 million and the market value of its mortgage backed securities as $67,248 million.

91.    By March 17, 2008, Wachovia shares had fallen to only $25.50 per share - down by more than half of the price its shares were trading at the start of the Class Period.

92.    Wachovia amended its first quarter of 2008 financials to report additional losses. On May 6, 2008 the Company filed a Form 8-K with the SEC reporting the following:

> "Wachovia has subsequently reviewed information regarding stable value agreements ("SVA") totaling $360 million provided by a third-party guarantor with respect to three related contracts within Wachovia's bank-owned life insurance ("BOLI") portfolio. Upon review of such information, Wachovia has concluded that the company will record valuation losses of $315 million on the related BOLT assets."

93.    On June 2, 2008, Defendant Thompson resigned at the request of the Board. Defendant Smith, Chairman of the Board, stated: "No single precipitating event caused the Board to reach this decision, but a series of previously disclosed disappointments and setbacks cumulatively have negatively impacted the company and its performance...." Id.

94.    On June 6, 2008, Wachovia stock closed at $20.13, a decline of 65% since the beginning of the Class Period,.

95.    Defendants' statements set forth above were materially false and misleading, for at least the following reasons:

    a. they failed to disclose the large amount of impaired mortgage debt on Wachovia's balance sheet.

b.    Defendants' portfolio of CDOs contained billions of dollars worth of impaired and highly risky securities, many of which were backed by subprime mortgage loans and which were difficult if not impossible to value;

c.    Defendants failed to properly account for highly leveraged loans such as mortgage securities; and

d.    Wachovia had been heavily involved in mortgages involving the pay-option adjustable ARMs. These pay-option ARMs provided that during the initial term of the loan borrowers could pay only as much as they desired with any underpayment being added to the loan balance. These loans would become toxic (for both Wachovia and the borrowers) once house prices stopped increasing at a rapid rate.

96.    Throughout the Class Period, the Defendants misrepresented the Company's financial condition and failed to provide accurate information regarding its failure to manage risk and the severe financial losses consequent of that mismanagement. These misrepresentations caused the price of Wachovia stock to be artificially inflated during the Class Period.

97.    Throughout the Class Period, the Company suffered from grave mismanagement and corresponding deterioration of its financial condition. As the consequences of this conduct have come to light, Wachovia's share price has lost approximately 65 percent of its value. Accordingly, under these circumstances, investment in Wachovia stock was imprudent, as reflected in the enormous losses suffered by the Plan.

## CAUSES OF ACTION

**Count I:    Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

98.    Plaintiffs incorporate by reference the paragraphs above.

99.    This Count alleges fiduciary breach against all Defendants other than the Director Defendants (the "Prudence Defendants").

100.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

101.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

102.    Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that the Funds were no longer suitable and appropriate investments for the Plan, but were, instead, imprudent investment in light of the Company's material undisclosed fundamental weaknesses.

103.    Nonetheless, during the Class Period, the Prudence Defendants continued to permit the Plan to offer the Funds as an investment option for Employee and Matching Contributions and continued to permit the Plan to invest those contributions in the Funds and permit the Funds to invest in Company stock.  They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares was artificially inflated.

104.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

105.    The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Funds, but had no such procedure.  Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Funds.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Funds under these circumstances.

106.    The Prudence Defendants breached their fiduciary duty respecting the Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

107.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

108.    According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

109.    According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

a.    Determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

b.    Consideration of the following factors as they relate to such portion of the portfolio:

c.    The composition of the portfolio with regard to diversification;

d.    The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

e.    The projected return of the portfolio relative to the funding objectives of the plan.

110.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Company stock because, among other reasons, Wachovia stock was not a prudent investment for the Participants' retirement savings.  Wachovia stock was not a prudent investment for the Participants' retirement savings because of fundamental weaknesses in the Company's internal controls related to credit and risk management and because of the Company's massive exposure to losses from sub-prime lending operations, including the holding of CDOs which were inscrutable investments which were during the initial Class Period (and remain) difficult if not impossible to value.

111.    The Prudence Defendants knew of and/or failed to investigate the failures of the Company as alleged above.

112.    The risk associated with the investment in Company stock during the Class Period were by far above and beyond the normal, acceptable risk associated with investment in company stock.

113.    This abnormal investment risk could not have been known by the Plan's Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the market generally, because the fiduciaries never disclosed it.

114.    Knowing of this extraordinary risk, and knowing the Participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any Participant from investing the Plan's assets in the Funds or Company stock.

115.    Further, knowing that the Plan was not adequately diversified, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

116.    The Prudence Defendants breached their fiduciary duties by, *inter alia*, failing to engage independent advisors who could make independent judgments concerning the Plan's investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's inappropriate practices; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the Plan's investment in Company stock.

117.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Prudence Defendants had discharged

their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

118.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count II:     Failure to Provide Complete and Accurate Information**
**                to Participants and Beneficiaries**

119.    Plaintiffs incorporate by reference the allegations above.

120.    This Count alleges fiduciary breach against all Defendants other than Wachovia Bank and the Director Defendants (the "Communications Defendants").

121.    As alleged above, during the Class Period the Communications Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

122.    As alleged above, the scope of the Communications Defendants' duties included disseminating Plan documents and/or Plan-related information to Participants regarding the Plan and/or assets of the Plan.

123.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan' assets, and to disclose

information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan' investment options such that Participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all the Plan' investment options, including investment in Company stock.

124.    This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Communications Defendants facilitated the illegal conduct in the first instance.

125.    The Communication Defendants were obligated to provide Participants with complete and accurate information concerning all of the Plan's assets, including Company stock. However, their duties of honest disclosure were especially significant with respect to Company stock because: a) during the Class Period, a large percentage of the Plan' assets were invested in it; b) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and c) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

126.    The Communications Defendants breached their ERISA duty to inform Participants by failing to provide complete and accurate information regarding the Company and

Company stock as alleged above, and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, the true risk and return characteristics of Wachovia stock and the prudence of investing retirement contributions in Wachovia stock.

127.    In particular, the Committee Defendants were responsible for communications made in the official Plan documents and materials which were disseminated directly to all participants to be used by participants in the management of the investment of their Plan accounts in the Fund, including the Plan's PIS which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports.

128.    These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in Company stock during the Class Period, with acquisitions of Company stock occurring at significantly inflated prices. Thus, the stock's precipitous decline in value had an enormous impact on the value of Participants' retirement assets. Had such disclosures been made to Participants, or Plan fiduciaries, if any, who were not aware of facts alleged herein, Participants and fiduciaries could have taken action to protect the Plan, and the disclosure to Participants, which necessarily would have been accompanied by disclosure to the market, would have assured that any further acquisitions of Company stock by the Plan would have occurred at an appropriate price.

129.    As a consequence of the failure of the Communications Defendants' to satisfy their duty to provide complete and accurate information under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings

in Company stock, or to appreciate that under the circumstances known or that should have been known to the Communications Defendants, but not known by Participants, Company stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.

130.    The Communications Defendants' failure to provide complete and accurate information regarding Company stock was uniform and Plan-wide, and impacted all Plan Participants the same way in that none of the Participants received crucial, material information regarding the risks of Company stock as a Plan investment option and all Plan acquisitions of employer stock during the Class Period occurred at inflated prices.

131.    As a consequence of the Communications Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Communications Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

132.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Communications Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count III:    Failure to Monitor Fiduciaries**

133.    Plaintiffs incorporate by reference the allegations above.

134.    This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

135.    As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

136.    As alleged above, the scope of the fiduciary responsibilities of the Director Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of the Committee Defendants.

137.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

138.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their

appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

139.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the Plan and the plan assets, or that may have an extreme impact on the Plan and the fiduciaries' investment decisions regarding the plan.

140.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

a.    failing, at least with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

b.    failing to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in Company stock;

c.    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in the Funds; and

   d.  failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Funds despite the practices that rendered Company stock an imprudent investment during the Class Period.

  141. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

  142. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count IV: Co-Fiduciary Liability**

  143. Plaintiffs incorporate by reference the allegations above.

  144. This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

  145. As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

146.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

147.    Knowledge of a Breach and Failure to Remedy. ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

148.    In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

149.    Knowing Participation in a Breach. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an

act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties. Moreover, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Fundsand, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

150.    Enabling a Breach. ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

151.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

152.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plans' other Participants and beneficiaries, lost millions of dollars of retirement savings.

153.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

154.    The Plan suffered millions of dollars in losses of vested benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in the Funds during the Class Period in breach of Defendants' fiduciary duties.

155.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plan of Company stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

156.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plan's assets should not have been invested in the Funds during the Class Period.

157.    As a consequence of the Defendants' breaches, the Plan suffered a significant loss of vested benefits.

158.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan....". Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate....".

159.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:

a.    a monetary payment to the Plan to make good to the Plan the loss of vested benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

b.    taxable costs and interest on these amounts, as provided by law; and

c.    such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits

the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.     Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.     An order for  for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

DATED:     June 30, 2008

ON BEHALF OF PLAINTIFFS:

By: _____

Edwin J. Mills (EM-7117)
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

Robert A. Izard
SCHATZ NOBEL IZARD P.C.
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
11 Hanover Square, 2nd Floor
New York, NY 10005
Telephone: 212-868-3610
Facsimile: 212-918-7967

Major Khan
MAJOR KHAN LLC
20 Bellevue Street
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755